**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISON**


| | | |
|---|---|---|
| **Eric J. Kimball,** | ) | **CASE NO. 1:24 CV 17** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Village of South Russell, et al.,** | ) | |
| | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendants.** | ) | |


<u>**INTRODUCTION**</u>

This matter is before the Court upon Defendants' Motion for Summary Judgment. (Doc. 22.) This is a Section 1983 case. For the reasons that follow, Defendants' Motion for Summary Judgment is GRANTED.

<u>**FACTS**</u>

Plaintiff Eric J. Kimball ("Kimball") filed this action against defendants Village of South Russell ("South Russell") and Michael Rizzo ("Chief Rizzo") (together, "Defendants"). Kimball served as a police officer with the Village of South Russell Police Department (the "Department") from sometime in 2015 until January 28, 2023—when he resigned. The nature of his resignation is the basis of Kimball's present suit against Defendants.

During his tenure with the Department, it is undisputed that Kimball's written performance records show an excellent work history with no formally documented issues. Additionally, Kimball was selected to attend the Law Enforcement Foundation's Police Executive Leadership College ("PELC"), which took place in Columbus, Ohio from January 16, 2023 through January 20, 2023.

Before Kimball left to attend the PELC, it is undisputed that his superior, Lieutenant Todd Pocek ("Lt. Pocek"), advised Kimball that he would submit Kimball's time sheet for the week spent training at the PELC. Despite this direction, Kimball submitted his own time sheet on January 25, 2023, after he returned from the PELC.[1] In that time sheet, Kimball requested seven hours of extra compensation time ("comp time"). The time sheet he submitted represented that he was working until 6:00 p.m. on January 20, 2023, which was the last day of the PELC training and the day he traveled home from Columbus. However, according to GPS equipment on the cruiser he drove to Columbus, and eventually Kimball's own admission, he left Columbus shortly after 12:30 p.m. and arrived home sometime between 2:30 p.m. and 2:48 p.m.

Sometime after Kimball filled out the time sheet on January 25, 2023, Lt. Pocek received Kimball's submitted time sheet and he noticed the requested seven hours of comp time. On January 27, 2023, Lt. Pocek called Kimball into his office to discuss the issue. Lt. Pocek asked Kimball what time he returned home on January 20, 2023. It is undisputed that Kimball responded sometime in the five o'clock hour.[2] Lt. Pocek then accused Kimball of lying and advised Kimball that he

---

[1] Kimball claims he did not mean to submit the time sheet before speaking with Lt. Pocek but the undisputed fact remains that he did in fact submit the time sheet.

[2] Kimball claims that when Lt. Pocek asked Kimball this question he was showing Kimball the time sheet he submitted. Kimball claims that he was merely reading the time listed on the time sheet

2

would need to meet with Chief Rizzo "in the near future to face potential charges." (Doc. 20, at 169:17–20.) Kimball testified that he understood "potential charges" to mean "Group 3 [disciplinary] charges plus additional criminal charges." (*Id.* at 169:25–170:1.) While the parties dispute whether Kimball admitted to lying in the January 27 meeting, it is undisputed that Kimball did not offer any other explanation for the false time sheet at that time.

Kimball then worked his regularly scheduled twelve-hour shift until 6:00 a.m. on January 28. Kimball went home from his shift for at least four hours before Lt. Pocek called him, asking him to meet with him and Chief Rizzo. Kimball showed up for the meeting without requesting any extension of time.[3] Although the parties dispute the specific dialogue, it is undisputed that during the January 28 meeting, Chief Rizzo explained that the purpose of the meeting was to discuss three "Group 3" disciplinary offenses, one "Group 1" disciplinary offense, and potential criminal charges. Chief Rizzo explained that Kimball could move forward with the investigation into the charges and explained that the potential penalties for the Group 3 offenses were "suspension, reduction in rank, termination, in addition to potential criminal charges." (Doc. 20, at 173:6–10.) Chief Rizzo then offered Kimball "another option"—to resign.

When asked for his decision during the January 28 meeting, Kimball chose to resign. Kimball did not ask for more time to consider his options, did not ask for any clarification about his options, and did not offer any explanation for the false time sheet. Kimball signed a pre-drafted

---

when he answered Lt. Pocek's question. However, this is a confusing explanation because the time listed on the time sheet was six o'clock—not sometime in the five o'clock hour.

[3] Kimball wrote that the meeting took place at 10:30 a.m. but Defendants and Defendants' documentation indicate that the meeting occurred at 11:30 a.m. When asked about the discrepancy Kimball did not dispute that the meeting actually took place at 11:30 a.m.

3

resignation letter that Chief Rizzo brought to the meeting. Kimball understood from the letter that his resignation was effective immediately. He testified that in signing the letter it was his intention to leave the department "in good standing, with nothing further coming from it." (Doc. 20, at 181:6–9.)[4]

Kimball now claims that the requested comp time was both a mathematical mistake to the extent he requested time after he returned home and that he intended to clarify with Lt. Pocek whether the hours spent driving would be compensated as regular pay or comp time. At no point during their meeting, however, did Kimball offer Lt. Pocek either of these explanations. Even further, Kimball never offered this explanation during the January 28 meeting with Chief Rizzo.

On January 4, 2024, Kimball brought this suit against Defendants, alleging Defendants violated his Due Process rights by wrongfully terminating him through a coerced resignation, and then tortiously interfered with his prospective business opportunities by portraying him in a false (and negative) light to prospective employers. Defendants now move for summary judgment entered in their favor as to all six of Kimball's claims. Kimball opposes Defendants' motion.

**STANDARD OF REVIEW**

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact[.]" Fed. R. Civ. P. 56(a); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine dispute of material fact rests with the moving party:

---

[4] A few days after signing the resignation letter, Kimball attempted to rescind his resignation. His attempted rescission was ultimately rejected by the mayor of South Russell because it was effective immediately.

4

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The mere existence of a scintilla of evidence in support of the [moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [moving party]." *Id.* at 252.

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). In doing so, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). "The nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). "The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). Moreover, if the evidence is "merely

colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249–50 (citation omitted).

## **ANALYSIS**

Kimball brings six different claims against the Defendants: (1) a claim that Defendants violated his Fourteenth Amendment Due Process Rights (Section 1983 claim); (2) a claim for declaratory judgment that he was wrongfully terminated in violation of Ohio Rev. Code § 737.19; (3) a claim that Chief Rizzo is civilly liable for violating Ohio Rev. Code § 2921.44 by engaging in a dereliction of his duty by failing to afford Kimball his Due Process rights; (4) a related claim that Chief Rizzo is civilly liable for violating Ohio Rev. Code § 2921.45(A) by violating Kimball's Due Process rights; (5) a claim that Defendants tortiously interfered with Kimball's prospective business opportunities; and (6) a claim that Defendants knowingly, willfully, and intentionally portrayed Kimball in a false (and negative) light to prospective employers.

Kimball's claims fail, however, because of the undisputed fact that Kimball voluntarily resigned from his position at the Department.

> **1.   Kimball's Claims that Defendants Wrongfully Terminated Him and Violated his Fourteenth Amendment Due Process Rights (Section 1983 and Declaratory Judgment Claims)**

A public employee has a property interest in his public employment if state law gives him a right to continued employment. *See Deoma v. Shaker Heights*, 68 Ohio App. 3d 72, 80–81 (Ohio Ct. App. 1990) (holding that Ohio Rev. Code § 124.34 gives classified public employees the right to continued employment except as provided therein). In Ohio, the termination of village police officers is governed by Ohio Rev. Code § 737.19, which provides that village police officers may only be terminated for cause. Courts have analogized the language in Section 737.19 governing the termination of village police officers to Section 124.34 which governs the tenure, reduction,

suspension, removal, and demotion of classified civil servants. *See Shaffer v. Vill. of W. Farmington*, 82 Ohio App. 3d 579, 587 (Ohio Ct. App. 1992).

In *Loudermill v. Cleveland Bd. of Educ.*, 470 U.S. 532, 542 (1985), the United States Supreme Court held that Section 124.34 creates a property interest in continued employment for classified civil servants because such employees can only be terminated for cause. Similarly, because Section 737.19 allows the termination of village police officers only for just or reasonable cause, Section 737.19 confers a property interest in continued employment to the employee. Under both statutes then, Due Process "requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *See Loudermill*, 470 U.S. at 542.

It is well established, however, that employees can waive their rights to these *Loudermill* pre-termination hearings. To be sure, "if an employee voluntarily resigns, thereby removing the need for a pre-termination hearing, he waives his right to a *Loudermill* pre-termination hearing." *Velazquez v. Vill. of Bratenahl*, 2003 WL 549967, at *3 (Ohio Ct. App. Feb. 27, 2003).

Generally, employee resignations are presumed to be voluntary, but an employee may rebut this presumption by producing evidence indicating that the resignation was involuntarily procured. *Rhoads v. Bd. of Educ. of Mad River Local Sch. Dist.*, 103 F. App'x 888, 895 (6th Cir. 2004). "Whether an employee's resignation was involuntary depends upon whether an objectively reasonable person would, under the totality of the circumstances, feel compelled to resign if he were in the employee's position." *Id.* To determine whether a resignation was involuntary, courts in the Sixth Circuit consider four factors: "(1) whether the employee was given an alternative to resignation, (2) whether the employee understood the nature of the choice [he] was given, (3)

7

whether the employee was given a reasonable time in which to choose, and (4) whether the employee could select the effective date of resignation." *Id.* (quoting *Lenz v. Dewey*, 64 F.3d 547, 552 (10th Cir. 1995)). "The mere fact that an employee is forced to choose between resignation and termination does not alone establish that a subsequent choice to resign is involuntary, provided that the employer had good cause to believe there were grounds for termination." *Id.* "On the other hand, an employee resigns involuntarily if, after being given a choice between resignation and termination, she is not granted sufficient time and opportunity to deliberate about the choice." *Id.*

Here, while Kimball does not dispute that he resigned from his position, he argues that his resignation was not voluntary. He claims that his resignation was "coerced" and "he was forced to resign after [Chief] Rizzo threatened him with criminal prosecution, insisted that he make an immediate decision between resigning or facing prosecution without any time or opportunity to consult with anyone to discuss his options, and required him to sign a pre-drafted resignation letter providing that his resignation was effective immediately." (Doc. 26, at 8.) He maintains that his resignation was "'so involuntary' that it 'amounted to a constructive discharge'" that "rise[s] to the level of a deprivation of a property interest without due process." (*Id.* at 18 (quoting *Nunn v. Lynch*, 113 F. App'x 55, 58–59 (6th Cir. 2004) (citing *Parker v. Bd. of Regents of Tulsa Jr. Coll.*, 981 F.2d 1159, 1161 (10th Cir. 1992))).)

Kimball fails, however, to point to sufficient probative evidence that his resignation was "so involuntary" that it amounts to a constructive discharge. First, Kimball claims that during the January 28 meeting he was given only two options: resign or face criminal prosecution. But Kimball's own testimony rebuts this assertion. Kimball testified that at the January 28 meeting, Chief Rizzo explained that the purpose of the meeting was to discuss three Group 3 offenses, one

8

Group 1 offense, and potential criminal charges. He testified that Chief Rizzo then explained the potential penalties for the Group 3 offenses, which were "suspension, reduction in rank, termination, in addition to potential criminal charges." (Doc. 20, at 173:6–10.) Chief Rizzo then offered Kimball "another option"—to resign. When specifically asked what options were presented to Kimball in the meeting, he testified "one was [ ] resignation" and the "other" was "moving forward with the charges and an investigation into the charges." (*Id.* at 174:3–7.) Further, in a clarifying question, Kimball was asked: "[T]he options that were tenured to you [were], go through an investigation and the possible outcomes[,] or resignation?" Kimball answered: "Correct." (*Id.* at 175:4–7.) Thus, while criminal charges were explained as a potential outcome of an investigation into Kimball's conduct, Kimball's own testimony rebuts his assertion that he faced some stark threat between resigning or certain criminal prosecution.

Second, Kimball claims that Defendants required him to make an "immediate decision" whether to resign or face criminal prosecution without giving him the opportunity to talk with anyone about his options or advising him of his rights under Section 737.19, that he could seek counsel, or that he could take time to decide what to do. But Kimball has not pointed to any evidence that this was the case.

Kimball asserts he was forced to make a decision within minutes during a single meeting on January 28, but this misconstrues the undisputed facts. Kimball knew about the underlying issue with his time sheet after his meeting with Lt. Pocek on January 27. Kimball then worked a twelve-hour shift and went home for at least four more hours before returning for the January 28 meeting at 11:30 a.m. Kimball showed up for the meeting as scheduled. There is no evidence that he asked for additional time before the meeting and was denied. Kimball testified that at the January 28 meeting

he was "pressured by Chief Rizzo to make a decision" because Chief Rizzo said "[w]e need a decision from you." (Doc. 20, at 175:11–15.) Kimball has not pointed to any other statement or demand from Chief Rizzo or Lt. Pocek that would have required him to make an immediate decision. Moreover, Kimball admitted that he did not ask for more time to think about his options.

Further, Kimball testified that he understood what his options were. As mentioned above, Kimball testified that Lt. Pocek foreshadowed his options at the January 27 meeting and Chief Rizzo presented his options again at the January 28 meeting, explaining the potential penalties should Kimball proceed with the process on disciplinary charges and offering Kimball the option to resign. He never testified that he asked any questions about the specifics of those options and was denied information. And unlike the case cited by Kimball, there is no evidence that Defendants prevented Kimball from consulting with his wife, or anyone else, before making a decision.[5] (Doc. 26, at 19 (citing *Dobos v. Howland Local Sch. Bd. of Educ.*, 2018 WL 538760, at *8 (N.D. Ohio Jan. 23, 2018) (finding factors weighed in favor of plaintiff in part because he requested that his wife be permitted to attend the disciplinary hearing, but his request was denied)).) *Cf. also Paroczay v. Hodges*, 297 F.2d 439, 441 (D.C. Cir. 1961) (finding resignation involuntary where the employee was told he had to sign a resignation letter before he left the supervisor's room, or charges would be filed immediately, despite his repeated requests to have more time and to consult

---

[5] Kimball never testified that he requested a lawyer and was denied the opportunity. While some courts outside the Sixth Circuit have considered whether an employee had the advice of counsel when assessing whether the employee resigned voluntarily, Kimball points to no controlling authority that required Defendants to unilaterally advise him to seek counsel's advice. *See, e.g.*, *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (including in "helpful" factors to assess whether resignation was voluntary, "whether the employee had the advice of counsel") (citing cases).

an attorney); *Angarita v. St. Louis Cnty.*, 981 F.2d 1537, 1545 (8th Cir. 1992) (finding resignation involuntary where employees were: not permitted to leave the interrogation room without first signing a resignation form; not presented with a specific complaint of their actions; denied requests to speak with their supervisors or have them present; threatened with disclosure of the allegations to their family; threatened with publicity in the media; and were not told the source of the allegations, among other things).

While Defendants pre-drafted Kimball's resignation letter and included the language that it was "effective immediately," this fact alone does not make Kimball's resignation involuntary. Kimball testified that he knew the letter said it was effective immediately. Kimball did not testify that he requested that the date be changed. Rather, Kimball testified that he chose to sign the resignation letter with the intention of leaving the department "in good standing, with nothing further coming from it." (Doc. 20, at 181:6–9.)

Further, despite Kimball's assertions to the contrary, the undisputed record evidence establishes that Defendants had good cause to believe that there were grounds for Kimball's termination. Specifically, it is undisputed that Kimball filled out a time sheet for the week he was at the PELC training (after Lt. Pocek told him not to fill out any time sheet for that week), requesting seven hours of comp time that Kimball admits he was not entitled to receive. Kimball now claims the request was a mistake, but when confronted about the false time sheet by Lt. Pocek at the January 27 meeting, Kimball concedes that he did not tell Lt. Pocek it was a mistake. Nor did Kimball offer this explanation at the January 28 meeting with Chief Rizzo.[6] Given these undisputed

---

[6] Kimball summarily contends in his opposition that "[a]t the time of [his] constructive discharge . . . . Kimball disputed [Lt. Pocek's] accusation that he admitted to lying." (Doc. 26, at 8.) Kimball

11

facts, whether it was a mistake or not, Kimball's false time sheet gave Defendants good cause to believe that there were grounds to terminate him.[7]

For all the aforementioned reasons, Kimball has failed to point to sufficient probative evidence that would allow a reasonable juror to find that a reasonable person in Kimball's position would feel compelled to resign. The undisputed facts evince that Kimball voluntary resigned from his position with the Department and waived his right to a *Loudermill* pre-termination hearing. *Velazquez*, 2003 WL 549967, at *3. Defendants are not liable for depriving Kimball of any Due Process rights because he waived them. Nor are Defendants liable for wrongfully terminating Kimball because he voluntarily resigned. Accordingly, Defendants are entitled to judgment entered in their favors as to Kimball's Section 1983 claim and claim for a declaratory judgment.[8]

---

never points to any evidence, however, that Defendants understood this to be the case. In fact, Chief Rizzo testified that Kimball never offered them an explanation. (Doc. 18, at 153:15–18 ("He did not offer us any explanation. . . [H]e did not state that this was incorrect, I made a mistake, none of that.").) The undisputed facts before this Court evince that Kimball failed to contest the accusations against him at either the January 27 or January 28 meeting. Whether Kimball was given an opportunity to explain himself at either meeting is beside the point for the present inquiry. Kimball's main defense of the false time sheet is that it was merely a mistake, yet he does not testify that he ever offered this explanation at either meeting, leaving Defendants without any innocent explanation for his comp time request.

[7] Kimball concedes that a police officer's failure to tell the truth is grounds for discipline, including termination, and that falsifying records is a crime. (Doc. 20, at 89:2–90:20.)

[8] Defendants correctly point out that even if Kimball was terminated and he believed it was wrongful, Ohio law requires him to appeal that termination with South Russell's City Council before seeking redress through the courts. Ohio Rev. Code § 737.19. Section 737.19 provides that "removal from the department . . . may be appealed to the legislative authority of the village within five days from the date of the mayor's judgment." If the legislative authority affirms the removal, "the person so removed may appeal on questions of law and fact the decision of the legislative authority to the court of common pleas of the county in which the village is situated. The person shall take the appeal within ten days from the date of the finding of the legislative authority."

2. **Kimball's Claims that Chief Rizzo Is Civilly Liable for Violating Ohio Rev. Code § 2921.44 and § 2921.45(A) by Violating Kimball's Due Process Rights**

Ohio Rev. Code § 2921.44 prohibits a public servant from engaging in a dereliction of his duty and Ohio Rev. Code § 2921.45(A) prohibits a public servant from violating any person's constitutional or statutory rights. Kimball claims that Chief Rizzo is liable under both by coercing Kimball to resign without a *Loudermill* hearing. Having determined that Kimball voluntarily resigned and waived his rights to a *Loundermill* hearing, it follows that Kimball's claims against Chief Rizzo under Ohio Rev. Code § 2921.44 and § 2921.45(A) must also fail.[9]

Accordingly, Chief Rizzo is entitled to judgment entered in his favor as to Kimball's claims under Ohio Rev. Code § 2307.60.

3. **Kimball's Claims that Defendants Portrayed Kimball in a False (And Negative) Light to Prospective Employers and Tortiously Interfered with His Prospective Business Opportunities**

Under Ohio law, "one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person,

---

Kimball does not dispute that he failed to adhere to Section 737.19's appellate procedures, but claims he had no appeal rights because Defendants denied his request to rescind his resignation. Kimball's argument is not well-taken. He points to no authority that would have prevented him from arguing before South Russell's City Council—as he does before this Court—that his resignation was coerced and involuntary and, thus, amounted to a wrongful termination. Under Ohio law, if the procedure for perfecting an administrative appeal is not followed, then the common pleas court does not have jurisdiction to hear the appeal. *Helms v. Akron Health Dept.*, 2004 WL 1459344, at *2 (Ohio Ct. App. June 30, 2004).

[9] Kimball seemingly concedes this outcome in his opposition to Defendants' motion. He offers no independent evidence to support these claims against Chief Rizzo, expect to claim that "a question of fact exists as to whether Kimball voluntary resigned" and "was offered a *Loundermill* hearing." (Doc. 26, at 25.)

and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Welling v. Weinfeld*, 866 N.E.2d 1051, 1059 (Ohio 2007). As a police officer, Kimball is a public figure for purposes of defamation or false light claims. *Soke v. Plain Dealer*, 69 Ohio St. 3d 395, 397 (1994). To establish his claim of false light as a public figure, Kimball must demonstrate actual malice on the part of the Defendants. *Murray v. Chagrin Valley Publ'g Co.*, 25 N.E.3d 1111, 1115–16 (Ohio Ct. App. 2014).

Moreover, Ohio law codified the common law qualified privilege for employers in connection with job performance information provided to prospective employers of current or former employees. *Miller v. J.B. Hunt Transp., Inc.*, 2013 WL 4807036, at *6–7 (Ohio Ct. App. Sept. 10, 2013) (citing Ohio Rev. Code § 4113.71(B))). Under Section 4113.71(B)

> An employer who is requested by an employee or a prospective employer of an employee to disclose to a prospective employer of that employee information pertaining to the job performance of that employee for the employer and who discloses the requested information to the prospective employer is not liable in damages in a civil action to that employee, the prospective employer, or any other person for any harm sustained as a proximate result of making the disclosure or of any information disclosed, unless the plaintiff in a civil action establishes * * * [either that]:
>
> (1) By a preponderance of the evidence that the employer disclosed particular information with the knowledge that it was false, with the deliberate intent to mislead the prospective employer or another person, in bad faith, or with malicious purpose; [or]
>
> (2) [T]hat the disclosure of particular information by the employer constitutes an unlawful discriminatory practice described in section 4112.02, 4112.021, or 4112.022 of the Revised Code.

14

This qualified privilege is also recognized by Ohio courts in claims of tortious interference with prospective business opportunities.[10] *Miller*, 2013 WL 4807036, at *6.

Kimball does not dispute that Defendants are entitled to this privilege absent a showing of actual malice, but contends that evidence establishes that Chief Rizzo acted with malice in responding to inquiries from the Mantua Police Department ("Mantua").[11] The only evidence Kimball points to, however, is the "omission of certain documents from Kimball's personnel file" and two comments that Kimball contends "falsely created the impression that Kimball had engaged in some type of wrongful conduct." (Doc. 26, at 26.) Specifically, "[w]hen asked if Kimball would be eligible for rehire, even though there was no disciplinary history, [Chief] Rizzo stated, 'in no uncertain terms,' that Kimball's rehire 'was not an option,'" and "[w]hen asked if there were any pending, or future actions, which would possibly follow Kimball and be a problem for Mantua, [Chief] Rizzo stated, 'he could not comment specifically on that.'" (*Id.* at 26–27.) Kimball also points out that Chief Rizzo agreed that his responses would raise "red flags" with Mantua.

None of these statements, however, evince any actual malice on part of the Defendants and cannot serve to overcome Defendants' qualified immunity to comment on the job performance of a former employee to prospective employers. Kimball does not contend that any of these statements, by themselves, are false. And while he contends that they created a false impression of wrongdoing,

---

[10] The elements for a claim of tortious interference with prospective business opportunities are (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom. *Geo-Pro Serv., Inc. v. Solar Testing Labs., Inc.*, 763 N.E.2d 664, 672 (Ohio Ct. App. 2001).

[11] Kimball does not mention any other potential employers in his complaint or opposition to Defendants' motion.

15

Kimball has not pointed to any evidence that Defendants deliberately intended to mislead Mantua[12] or made any comments in bad faith or with malicious purpose. In fact, Chief Rizzo testified that he wanted Kimball to have an opportunity to find other work. Kimball does not point to any evidence to the contrary and even testified that he was not aware of any specific disparaging comments that Chief Rizzo made to Mantua.[13]

Accordingly, Kimball has failed to establish any malice on the part of Defendants that portrayed Kimball in a false light to prospective employers or tortiously interfered with his prospective business opportunities. For this reason, Defendants are entitled to judgment entered in their favor on these claims.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.


IT IS SO ORDERED.

   /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated:  2/6/25

---

[12] As discussed throughout this opinion, Kimball never offered Defendants an explanation for the false time sheet until after he resigned. Accordingly, it is undisputed that Chief Rizzo held the belief that Kimball lied in submitting his time sheet. This Court takes no position on the veracity of that belief, but it does inform Chief Rizzo's calculated comments to Mantua.

[13] Kimball also references a form Chief Rizzo submitted to the Ohio Peace Officer Training Commission after Kimball resigned that denoted Kimball's separation was due to "Resignation – Under Investigation." Chief Rizzo testified that he chose this denotation on the form because he considered it to be the most accurate option. Kimball contends the denotation was false, but Kimball fails to tie this form to any interference with a business opportunity or point to any evidence that it was done with malice.